# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | Criminal No. |
|  | § |  |
| **v.** | § |  |
|  | § | **UNDER SEAL** |
| **EARNEST GIBSON III,** | § |  |
| **EARNEST GIBSON IV,** | § |  |
| **WILLIAM BULLOCK III,** | § |  |
| **ROBERT FERGUSON,** | § |  |
| **REGINA ASKEW,** | § |  |
| **LESLIE CLARK, and** | § |  |
| **ROBERT CRANE,** | § |  |
|  | § |  |
| **Defendants.** | § |  |



H 12 -600

United States Courts
Southern District of Texas
FILED

OCT 1 2012

David J. Bradley, Clerk of Court

## INDICTMENT

The Grand Jury charges:

### General Allegations

At all times material to this Indictment, unless otherwise specified:

1.      The Medicare Program ("Medicare") was a federal healthcare program providing benefits to individuals who were over the age of 65 or disabled.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.  Medicare was a "healthcare benefit program" as defined by Title 18, United States Code, Section 24(b).

2.      Medicare was subdivided into multiple Parts.  Medicare Part B covered partial hospitalization programs ("PHPs") connected with the treatment of mental illness.  The treatment program of PHPs closely resembled that of a highly structured, short-term hospital inpatient program, but it was a distinct and organized intensive treatment program that offered less than 24-hour daily care.

3.      Patients eligible for Medicare coverage of a PHP comprised two groups:  (1) those patients who were discharged from an inpatient hospital treatment program, and the PHP is in lieu of continued inpatient treatment and (2) those patients who, in the absence of partial hospitalization, would require inpatient hospitalization.

4.      Medicare guidelines required that patients admitted to a PHP required PHP services at levels of intensity and frequency comparable to patients in an inpatient setting for similar psychiatric illnesses.

5.      Under the PHP benefit, Medicare covered the following services:  (1) individual and group psychotherapy with physicians, psychologists or other mental health professionals; (2) occupational therapy requiring the skills of a qualified occupational therapist; (3) services of social workers, trained psychiatric nurses and other staff trained to work with psychiatric patients; (4) drugs and biologicals furnished for therapeutic purposes that could not be self-administered; (5) individualized activity therapies that were not primarily recreational or diversionary; (6) family counseling services for which the primary purpose was the treatment of the patient's condition; (7) patient education programs where the educational activities were closely related to the care and treatment of the patient; and (8) diagnostic services.

6.      Medicare guidelines specifically excluded meals and transportation from coverage under the PHP benefit.

7.      Medicare did not cover programs providing primarily social, recreational or diversionary activities.  Medicare excluded from coverage programs attempting to maintain psychiatric wellness and treatment of chronic conditions without acute exacerbation. Psychosocial programs that provided only a structured environment, socialization or vocational rehabilitation were not covered by Medicare.

2

8.    Medicare required that the PHP was provided at a facility that was hospital based or hospital affiliated or at a community mental health center.

9.    Individuals who qualified for Medicare benefits were commonly referred to as Medicare "beneficiaries." Each beneficiary was given a Medicare identification number.

10.    Hospitals, physicians and other healthcare providers that provided services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an application in which the providers agreed to comply with all Medicare related laws and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A healthcare provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for services rendered to beneficiaries.

11.    Medicare paid hospitals and other healthcare providers for services rendered to beneficiaries. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company.

12.    CMS contracted with Medicare Administrative Contractors ("MACs") to process claims for payment. The MAC that processed and paid Medicare Part B claims for PHP services in Texas was TrailBlazer Health Enterprises, LLC ("TrailBlazer").

13.    To bill Medicare for services rendered, a provider submitted a claim form (Form 1500) to TrailBlazer. When a Form 1500 was submitted, usually in electronic form, the provider certified that: (1) the contents of the form were true, correct and complete; (2) the form was prepared in compliance with the laws and regulations governing Medicare; and (3) the contents of the claim were medically necessary.

14.     A Medicare claim for PHP reimbursement was required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the item or service provided to the beneficiary, the date the item or service was provided, the cost of the item or service, and the name and unique physician identification number of the physician who prescribed or ordered the item or service.

15.     A Houston hospital ("the Hospital") was a Texas non-profit entity doing business in and around Houston, Texas.   The Hospital billed Medicare for PHP services purportedly provided at the Hospital locations and for services purportedly provided by independent contractors at satellite locations.

16.     Defendant **EARNEST GIBSON III**, a resident of Harris County, Texas, was the President and Administrator of the Hospital.

17.     Defendant **EARNEST GIBSON IV**, a resident of Fort Bend County, Texas, was the administrator of the PHP known as Devotions Care Solutions Partial Hospitalization Program ("Devotions PHP"), a satellite PHP of the Hospital.

18.     Defendant **WILLIAM BULLOCK III,** a resident of Harris County, Texas, was a co-owner and operator of the PHP known as Dynamic PHP or Caroline Partial Hospital Program ("Dynamic PHP"), a satellite PHP of the Hospital, and a patient recruiter for the Hospital.

19.     Defendant **ROBERT FERGUSON**, a resident of Harris County, Texas, oversaw marketing for Dynamic PHP and was a patient recruiter for the Hospital.

20.     Defendant **REGINA ASKEW**, a resident of Harris County, Texas, was a patient recruiter and patient file auditor for the Hospital.

21.     Defendant **LESLIE CLARK**, a resident of Harris County, Texas, was a patient recruiter for the Hospital.

4

22.     Defendant **ROBERT CRANE**, a resident of Harris County, Texas, was a driver and patient recruiter for Devotions PHP, a satellite PHP of the Hospital.

23.     Mohammed Khan, a resident of Harris County, Texas, was an Assistant Administrator at the Hospital who managed and controlled the day-to-day operations of several of the Hospital's PHPs.

**COUNT 1**
**Conspiracy to Commit Health Care Fraud**
**(18 U.S.C. § 1349)**

24.     Paragraphs 1 through 23 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

25.     From in or around January 2005, through in or about June 2012, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas, and elsewhere, defendants,

**EARNEST GIBSON III,**
**EARNEST GIBSON IV,**
**WILLIAM BULLOCK III,**
**ROBERT FERGUSON**, and
**REGINA ASKEW,**

did knowingly and willfully combine, conspire, confederate and agree with others known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1347, that is, to execute a scheme and artifice to defraud a healthcare benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said healthcare benefit program, in connection with the delivery of and payment for healthcare benefits, items and services.

## Purpose of the Conspiracy

26.     It was a purpose and object of the conspiracy for **EARNEST GIBSON III**,

**EARNEST GIBSON IV**, **WILLIAM BULLOCK III**, **ROBERT FERGUSON**, **REGINA**

**ASKEW**, and their co-conspirators, including Mohammad Khan, to unlawfully enrich

themselves by, among other things:  (a) submitting false and fraudulent claims to Medicare

through the Hospital for services that were medically unnecessary, services that were not eligible

for Medicare reimbursement, and services that were not provided; (b) offering and paying

kickbacks and bribes to patient recruiters, group home owners and assisted living facility

("ALF") owners in exchange for those recruiters, group home owners and ALF owners sending

Medicare beneficiaries to the Hospital for PHP services that were not medically necessary and,

in some cases, not provided; (c) concealing the submission of false and fraudulent claims to

Medicare and the payment of kickbacks and bribes to patient recruiters, group home owners and

ALF owners; and (d) diverting proceeds of the fraud for the personal use and benefit of the

defendants and their co-conspirators, including Mohammad Khan.

## Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators, including

Mohammad Khan, sought to accomplish the purpose and object of the conspiracy included,

among other things:

27.     **EARNEST GIBSON III** would maintain a Medicare provider number for the

Hospital that the defendants and their co-conspirators would use to submit claims to Medicare

for PHP services.

28.     As Administrator of the Hospital, **EARNEST GIBSON III** would oversee the

operation of the Hospital's PHPs.

29.     **EARNEST GIBSON IV** would manage and control the day-to-day operations of Devotions PHP, a satellite PHP of the Hospital.

30.     **EARNEST GIBSON IV** would submit claims to Medicare through the Hospital for PHP services purportedly provided at Devotions PHP that were not medically necessary and, in some cases, not provided.

31.     **WILLIAM BULLOCK III** would co-own and operate Dynamic PHP, a satellite PHP of the Hospital, and would submit claims to Medicare through the Hospital for PHP services purportedly provided at Dynamic PHP that were not medically necessary and, in some cases, not provided.

32.     **ROBERT FERGUSON** would oversee the payment of health care kickbacks to patient recruiters, group home owners and ALF owners in exchange for those recruiters, group home owners and ALF owners sending Medicare beneficiaries to Dynamic PHP, a satellite PHP of the Hospital, for PHP services that were not medically necessary and, in some cases, not provided.

33.     **REGINA ASKEW** and her co-conspirators would falsify and cause to be falsified patient files to make it appear that the services for which the Hospital billed Medicare were medically necessary and met the Medicare criteria for reimbursement.

34.     **EARNEST GIBSON III, EARNEST GIBSON IV, WILLIAM BULLOCK III, ROBERT FERGUSON, REGINA ASKEW, ROBERT CRANE,** and their co-conspirators, including Mohammad Khan, would pay and cause the payment of kickbacks to patient recruiters, group home owners and ALF owners in exchange for the recruiters, group home owners and ALF owners sending patients to the Hospital for PHP services that were not medically necessary and, in some cases, not provided.

35.     **WILLIAM BULLOCK III**, **ROBERT FERGUSON**, **REGINA ASKEW**, **LESLIE CLARK**, and **ROBERT CRANE** would receive kickbacks in exchange for sending patients to the Hospital for PHP services that were not medically necessary and, in some cases, not provided.

36.     **EARNEST GIBSON III**, **EARNEST GIBSON IV**, **WILLIAM BULLOCK III**, **ROBERT FERGUSON**, and their co-conspirators, including Mohammad Khan, would pay and cause the payment of bribes and kickbacks, in the form of cigarettes, food and coupons redeemable for items available at the Hospital's "country stores," to Medicare beneficiaries in exchange for those beneficiaries attending the Hospital's PHPs.

37.     Medicare beneficiaries at the Hospital's PHPs, including Dynamic PHP, would watch television and play games and engage in other non-PHP activities rather than receiving the PHP services for which the Hospital billed Medicare.

38.     **EARNEST GIBSON III**, **EARNEST GIBSON IV**, **WILLIAM BULLOCK III**, **ROBERT FERGUSON**, **REGINA ASKEW**, and their co-conspirators, including Mohammad Khan, would submit and cause to be submitted approximately $158 million in claims to Medicare for PHP services purportedly provided by the Hospital, when in fact, such PHP services were not medically necessary and, in some cases, never provided.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### Conspiracy to Defraud the United States and to
### Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

39.     Paragraphs 1 through 23 and 27 through 38 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

40.     From in or around January 2005, through in or about June 2012, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas, and elsewhere, the defendants,

**EARNEST GIBSON III,**
**EARNEST GIBSON IV,**
**WILLIAM BULLOCK III,**
**ROBERT FERGUSON,**
**REGINA ASKEW,**
**LESLIE CLARK**, and
**ROBERT CRANE,**

did knowingly and willfully combine, conspire, confederate and agree with others known and unknown to the grand jury, to commit certain offenses against the United States, that is,

a.      to defraud the United States by impairing, impeding, obstructing and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of the Medicare program;

b.      to violate Title 42, United States Code, Section 1320a-7b(b)(1), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare; and

c.      to violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, specifically, kickbacks and bribes,

directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

### Purpose of The Conspiracy

41.     It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by paying and receiving kickbacks and bribes in exchange for the referral of Medicare beneficiaries for whom the Hospital would submit claims to Medicare.

### Manner and Means of The Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

42.     Paragraphs 27 through 38 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

### Overt Acts

43.     In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Houston Division of the Southern District of Texas, the following overt acts:

a.     On or about February 18, 2011, defendant **EARNEST GIBSON III** and his co-conspirators, including Mohammad Khan, paid and caused the payment of approximately $2,500 to defendant **REGINA ASKEW** in exchange for **REGINA ASKEW** sending Medicare beneficiaries to a Hospital PHP for PHP services.

b.      On or about April 28, 2011, defendant **EARNEST GIBSON III** and his co-conspirators, including Mohammad Khan, paid and caused the payment of approximately $2,000 to defendant **REGINA ASKEW** in exchange for **REGINA ASKEW** sending Medicare beneficiaries to a Hospital PHP for PHP services.

c.      On or about May 10, 2011, defendant **EARNEST GIBSON III** and his co-conspirators, including Mohammad Khan, paid and caused the payment of approximately $3,000 to defendant **REGINA ASKEW** in exchange for **REGINA ASKEW** sending Medicare beneficiaries to a Hospital PHP for PHP services.

d.      On or about May 12, 2011, defendant **EARNEST GIBSON III** and his co-conspirators, including Mohammad Khan, paid and caused the payment of approximately $2,500 to defendant **ROBERT FERGUSON** in exchange for **ROBERT FERGUSON** referring Medicare beneficiaries to a Hospital PHP for PHP services.

e.      On or about May 17, 2011, defendant **EARNEST GIBSON III** and his co-conspirators, including Mohammad Khan, paid and caused the payment of approximately $1,950 to defendants **WILLIAM BULLOCK III** and **LESLIE CLARK** in exchange for **WILLIAM BULLOCK III** and **LESLIE CLARK** sending Medicare beneficiaries to a Hospital PHP for PHP services.

f.      On or about May 26, 2011, defendant **EARNEST GIBSON III** and his co-conspirators, including Mohammad Khan, paid and caused the payment of approximately $2,500 to defendant **ROBERT FERGUSON** in exchange for **ROBERT FERGUSON** referring Medicare beneficiaries to a Hospital PHP for PHP services.

g.      On or about May 31, 2011, defendant **EARNEST GIBSON III** and his co-conspirators, including Mohammad Khan, paid and caused the payment of approximately

$1,950 to defendants **WILLIAM BULLOCK III** and **LESLIE CLARK** in exchange for **WILLIAM BULLOCK III** and **LESLIE CLARK** sending Medicare beneficiaries to a Hospital PHP for PHP services.

        h.    In or about August 2011, co-conspirator Mohammad Khan and defendant **WILLIAM BULLOCK III** agreed that the Hospital would pay **WILLIAM BULLOCK III** more than $300 for each Medicare beneficiary defendant **WILLIAM BULLOCK** referred to a Hospital PHP for PHP services.

        i.    On or about November 18, 2011, defendants **EARNEST GIBSON III** and **EARNEST GIBSON IV** and their co-conspirators, paid and caused the payment of $3,400 to co-conspirator Patient Recruiter #1 in exchange for Patient Recruiter #1 sending Medicare beneficiaries to Devotions PHP, a Hospital PHP satellite location, for PHP services.

        j.    On or about December 6, 2011, defendants **EARNEST GIBSON III** and **EARNEST GIBSON IV** and their co-conspirators, paid and caused the payment of $3,200 to co-conspirator Patient Recruiter #1 in exchange for Patient Recruiter #1 sending Medicare beneficiaries to Devotions PHP, a Hospital PHP satellite location, for PHP services.

All in violation of Title 18, United States Code, Section 371.

**COUNTS 3-12**
**Anti-Kickback Statute**
**(42 U.S.C. § 1320a-7b(b), 18 U.S.C. § 2)**

    44.    Paragraphs 1 through 23, 27 through 38, and 43 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

    45.    On or about the dates enumerated below, in Harris County, in the Southern District of Texas, and elsewhere, the defendants

**EARNEST GIBSON III,**
**EARNEST GIBSON IV,**
**WILLIAM BULLOCK III,**
**ROBERT FERGUSON,**
**REGINA ASKEW,** and
**LESLIE CLARK,**

and their co-conspirators, including Mohammad Khan, aiding and abetting others known and unknown to the Grand Jury, as set forth below, did knowingly and willfully offer and pay and did knowingly and willfully solicit and receive remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole or in part by a Federal health care program, that is, Medicare:

| Count | Defendant(s) | On or about Date | Approximate Amount of Kickback |
|-------|--------------|------------------|--------------------------------|
| 3 | **EARNEST GIBSON III** paid **REGINA ASKEW** | February 18, 2011 | $2,500 |
| 4 | **EARNEST GIBSON III** paid **REGINA ASKEW** | April 28, 2011 | $2,000 |
| 5 | **EARNEST GIBSON III** paid **REGINA ASKEW** | May 10, 2011 | $3,000 |
| 6 | **EARNEST GIBSON III** paid **ROBERT FERGUSON** | May 12, 2011 | $2,500 |
| 7 | **EARNEST GIBSON III** paid **WILLIAM BULLOCK III** and **LESLIE CLARK** | May 17, 2011 | $1,950 |

| Count | Defendant(s) | On or about Date | Approximate Amount of Kickback |
|-------|--------------|------------------|-------------------------------|
| 8 | **EARNEST GIBSON III** paid **ROBERT FERGUSON** | May 26, 2011 | $2,500 |
| 9 | **EARNEST GIBSON III** paid **WILLIAM BULLOCK III** and **LESLIE CLARK** | May 31, 2011 | $1,950 |
| 10 | **WILLIAM BULLOCK III** | August 2011 | More than $300 per beneficiary referred |
| 11 | **EARNEST GIBSON III** and **EARNEST GIBSON IV** paid co-conspirator Patient Recruiter #1 | November 18, 2011 | $3,400 |
| 12 | **EARNEST GIBSON III** and **EARNEST GIBSON IV** paid co-conspirator Patient Recruiter #1 | December 6, 2011 | $3,200 |

All in violation of Title 42, United States Code, Section 1320a-7b(b) and Title 18, United States Code, Section 2.

<u>**COUNT 13**</u>
**Conspiracy to Commit Laundering of Monetary Instruments**
**(18 U.S.C. § 1956(h))**

46.     Paragraphs 1 through 23, 27 through 38, and 43 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

47.     From in or around January 2005, through in or about June 2012, the exact dates being unknown to the Grand Jury, in the Houston Division of the Southern District of Texas, and elsewhere, the defendants,

**EARNEST GIBSON III** and
**EARNEST GIBSON IV,**

14

did willfully and knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury, to commit offenses against the United States in violation of Title 18, United States Code, Sections 1956, that is, to knowingly conduct a financial transaction affecting interstate and foreign commerce, which financial transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and with the intent to promote the carrying on of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

It is further alleged that the specified unlawful activity was to commit health care fraud, in violation of Title 18, United States Code, Section 1347.

In violation of Title 18, United States Code, Section 1956(h).

## Purpose of the Conspiracy

48.     It was a purpose of the conspiracy for the defendants and their co-conspirators to engage in money laundering for the purpose of (1) unlawfully enriching themselves and their co-conspirators; and (2) promoting the health care fraud scheme by paying kickbacks in exchange for patient recruiters, group home owners and ALF owners providing Medicare beneficiaries to the Hospital so that the Hospital could bill Medicare for services that were not medically necessary and not provided.

## Manner and Means of the Conspiracy

The manner and means by which the defendants and their co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things,

49.     **EARNEST GIBSON III** and **EARNEST GIBSON IV** caused Medicare to electronically transfer funds into the Hospital bank accounts, which were controlled by

**EARNEST GIBSON III**, as payment on claims the Hospital submitted to Medicare for PHP services.

50.     **EARNEST GIBSON III** transferred and caused the transfer of funds obtained from Medicare from the Hospital's bank accounts to Devotions PHP's bank accounts, which were controlled by **EARNEST GIBSON IV**.

51.     **EARNEST GIBSON III** and **EARNEST GIBSON IV** paid and caused the payment of a portion of the funds derived from the Medicare fraud scheme to pay patient recruiters and group home owners in exchange for the patient recruiters and group home owners sending Medicare beneficiaries to the Hospital so that the Hospital could submit additional fraudulent claims to Medicare for PHP services that were not medically necessary and, in some cases, never provided.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. §§ 982(a)(7), 981(a)(1)(C), and 28 U.S.C. § 2461)

52.     Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to the defendants **EARNEST GIBSON III, EARNEST GIBSON IV, WILLIAM BULLOCK III, ROBERT FERGUSON, REGINA ASKEW, LESLIE CLARK,** and **ROBERT CRANE** that, in the event of conviction for any of the violations charged in Counts One through Thirteen of the Indictment, the United States intends to forfeit all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of any such offense, including, but not limited to, a money judgment in the amount of at least $46,275,411.00 in United States currency, for which the defendants may be jointly and severally liable.

53.     In the event that the property subject to forfeiture as a result of any act or omission of a defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided
        without difficulty,

it is the intent of the United States to seek forfeiture of any other property of the defendant up to

the total value of the property subject to forfeiture, pursuant to Title 21, United States Code,

Section 853(p), incorporated by reference in Title 18, United States Code, Section 982(b)(1), and

Title 28, United States Code, Section 2461.

A TRUE BILL

Original Signature on File

FOREPERSON


KENNETH MAGIDSON
UNITED STATES ATTORNEY

_____
LAURA M.K. CORDOVA
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE